# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Kayla Potega | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16 CV 50110 |
| | ) Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. Based on the record, Plaintiff Kayla Potega can be portrayed in at least two ways.

On the one hand, Plaintiff can be viewed as a young, articulate person who does yoga and pole fitness, writes a healthy living and lifestyle blog, makes jewelry that she sells on Etsy, shops at thrift stores and garage sales, goes fishing, has a boyfriend, is in a book club, but who also just happens to be a malingerer, or even faker, of a disease that is difficult to dispute.

On the other hand, Plaintiff can be portrayed as a bedridden person with a long history of difficult-to-diagnose-and-treat possible diseases, including, but not limited to, fibromyalgia, Lyme disease and postural orthostatic tachycardia syndrome, who needs either a walker or wheelchair to locomote and suffers from "fibro fog."

The Court certainly understands how the Administrative Law Judge ("ALJ") chose the latter portrait of Plaintiff, as there is ample record evidence to support that view. But because the ALJ's route to that choice was faulty (succumbing to the elaborate array of Social Security regulations and Seventh Circuit case law pitfalls), this Court is compelled to remand the case.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Plaintiff alleges that she suffers from fibromyalgia and other, possibly-related conditions. In 2013, she filed an application for supplemental security income. She was 23 years old. But her medical problems first emerged nine years early, when she was 14. In March 2004, she went to the hospital complaining of body-wide pain, fatigue, cognitive problems, and weakness in her legs. R. 365. Over the years, she saw numerous doctors in an effort to pinpoint the cause of her problems. Doctors offered various diagnoses along the way, some of which were later rejected, including Guillain-Barre syndrome and reflex sympathetic dystrophy and Lyme disease. In 2005, plaintiff's parents took her to the Mayo Clinic (apparently at their own expense), and those doctors diagnosed her with postural orthostatic tachycardia syndrome ("POTS"). Eventually, her treating physicians settled on a working diagnosis of fibromyalgia. Plaintiff alleges that she experiences flares during which she is sometimes bedridden. She also alleges that she has used a wheelchair or walker for many years. The administrative law judge ("ALJ") agreed that plaintiff's fibromyalgia qualified as a severe impairment, but doubted the allegations about the intensity of her pain. Most notably, the ALJ concluded that plaintiff's wheelchair/walker allegation was fabricated. As explained below, the Court finds that the ALJ's decision rests on ambiguous or not-fully-developed evidentiary foundations and also lacks a supporting medical opinion.

## BACKGROUND

The hearing was held on October 28, 2014. Plaintiff testified that she was 24 years old and lived with her parents. The only place she had worked was at Rock Cut Concessions in 2008 (for three months), and then again in 2012 (for two weeks). She quit each time because of relapses. The ALJ asked plaintiff to describe her relapses. She answered as follows:

> Usually when I had a relapse I start feeling very, I don't know, draggy I guess, very fatigued. My legs start to feel very achy, painful, and they have issues working. I

> have to have a wheelchair and a walker. Sometimes I have to even take a potty chair into my room because I can't make it to the bathroom. I go [] several weeks without showering because I'm just too tired to do it, too tired and in pain. A lot of global body pain, that's a daily thing and it depends on the day if it's manageable or over the manageable limit. A lot of brain fog, trouble concentrating. Sometimes I'm bed bound, sometimes I'm able to walk with the aid of a walker. And if it's really bad it has to be a wheelchair. And I would say these flares occur—it depends on the year. Last year was a decent enough year. This year it's probably once every—once a month I would say, on average. [] They can last for a couple days to several months. The longest I've had was 10 months, the shortest I've had was maybe three or four days. The current one I'm in is lasting three months.

R. 37-38. Plaintiff testified that there was no rhyme or reason as to when the flares would occur, although she speculated seasonable changes were a cause and that food and stress played a role.

The ALJ asked whether the cause was the POTS, Lyme disease, fibromyalgia, or something else. Plaintiff stated that her current doctor, Dr. Sridhar, stated that the cause was "probably" fibromyalgia. Plaintiff added that she had talked to "several Lyme literate[] [doctors] in the past [and they] agree that the Lyme can flare up every now and again with certain—like the weather, stuff like that." R. 40. Plaintiff had not seen one of these doctors since 2009. When asked why she did not continue with these doctors, plaintiff stated that one of them "wanted to do antibiotic treatment, and [she was] very sensitive to Western medicine." R. 40-41. Plaintiff explained that the doctor "wanted to do three separate antibiotics in a port straight to the heart." R. 41. Plaintiff declined this treatment due to her "medicine sensitivity" and opted to pursue alternative treatments such as acupuncture, herbals, homeopathics, and massage therapy. The ALJ asked plaintiff about the fact that she was "just on Cipro" (an antibiotic), and plaintiff stated that she received this medication in the emergency room and that taking this drug for two weeks was much different than the invasive, year-long treatment the Lyme doctor proposed.

Plaintiff's counsel asked about plaintiff's "sensitivity to Western medicine," and plaintiff stated that she was referring to side effects ranging from "severe migraines to emotional

3

reactions to physical [reactions] like hive reactions." R. 44. In the last year, she had been confined to bed "at least once a month for on average a week to a week and a half." *Id.* Plaintiff was currently using a walker and had used it every day for the past three or four months and "prior to that probably once a month again for at least a week to a week and a half." R. 44-45. When not having a flare, plaintiff could "pretty much do everything normally." R. 45.

Plaintiff stated that her high school had a homebound program so that when she was not feeling well she could stay at home and send her work in. There was some confusion about when plaintiff last took college classes, with plaintiff explaining that she took some online courses and some regular "physical" classes. Plaintiff had earned 15 college credits. The ALJ noted that plaintiff had recently started working with a pain management doctor, Dr. Rosche, who she had seen twice. Dr. Rosche prescribed a Fentanyl patch for pain, and had ordered an MRI.

Plaintiff had taken herbals and homeopathics and had also done acupuncture. When the ALJ asked "who's in charge of [] all this stuff," plaintiff explained as follows:

> I am when I'm able to. If—when I'm having my good days I have a whiteboard in my room and I write down everything that I need to take for the day. I have alarms set because sometimes I need to take things several times a day. So in order for me to actually remember I'll have the alarms. And when I'm bed bound or not feeling too well my mom will help out. She'll make my teas, she'll remind me to do things, to take things.

R. 54. The ALJ observed that plaintiff's activities did not "seem entirely compatible with somebody spending a lot of time in bed in the fall" and noted that plaintiff indicated to Dr. Sridhar in October 2013 that she was doing yoga two times a week along with pole fitness and that plaintiff was "making jewelry, blogging, reading, other exercising." R. 56. Plaintiff explained that last year, including the fall "was anomaly" and that she "was doing very well last year." *Id.* She stated that the last time she did yoga or pole fitness was in the beginning of the spring because she had since relapsed.

4

The ALJ asked about other medications. Plaintiff stated that she took "some Tylenol 3 with Codeine or Ultram or Advil" when the pain got unmanageable. R. 59-60. Dr. Sridhar prescribed these medications. The ALJ asked plaintiff how often she blogged. Plaintiff stated that the "good thing about blogging is I can do that in bed" and that she did it "quite often." R. 61. Plaintiff's blog was called The Eclectic Element, which was a healthy living and lifestyle blog. She had a couple advertisers and made about an average of $100 a month. Plaintiff enjoyed doing crafts but was focusing recently on handmade jewelry, which she sold through two Etsy accounts. The vintage jewelry was "anything that [she found] at like garage sales and Salvation Army and thrift stores." R. 62. She had not been to a garage sale in several months, but stated that "thankfully now that [she was] actually able to walk with the wheelchair and the walker [] [she] would say within the last week is when [she had] been able to go to garage sales and pick up at the thrift stores."[2] R. 63.

The ALJ then asked about references to plaintiff being "quite an outdoors person, liking hunting, fishing[,] kayaking." R. 63. Plaintiff stated that she was not able to go kayaking this summer but "the most I was able to do was go fishing with my boyfriend maybe three or four times." R. 64. The ALJ described plaintiff as sounding "incredibly literate" in her testimony, and asked what she was reading. Plaintiff stated that she had not been reading "too much," but that she recently joined a book club. R. 65. The ALJ asked whether plaintiff was required to contribute money to the house or do chores in exchange for still living with her parents. Plaintiff stated that, when she was able, she would do "chores around the house like vacuuming, maybe cleaning the windows, doing dishes" and

---

[2] Pertinent to the malingering discussion below, plaintiff's reference to "now" using a wheelchair and walker could arguably support the ALJ's malingering theory. On remand, the ALJ will be able to ask more specific questions to clarify these points.

5

that she did her own laundry "when [she was] feeling up to it." R. 65. The ALJ asked whether plaintiff had any mental health treatment in the last two years. She said no. The ALJ concluded by observing that plaintiff had been "really helpful" in answering questions.

On December 8, 2014, the ALJ found plaintiff not disabled. The ALJ found that plaintiff 's fibromyalgia was a severe impairment, although the ALJ later made statements casting doubt on this conclusion.[3] The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform sedentary work.

## DISCUSSION

Plaintiff has two main arguments for a remand. The first is that the ALJ engaged in a speculative and incomplete credibility analysis. The second is that the ALJ failed to give controlling weight to the opinions of her two treating physicians.

**I.     Credibility.**

As both sides agree, the ALJ's credibility determination was critical. The ALJ found that plaintiff's fibromyalgia qualified as a severe impairment and that it could, in theory, cause the work-disabling symptoms plaintiff was alleging. In fact, the ALJ limited plaintiff to sedentary work to account for some of the flares and intermittent walking problems. Despite this conclusion, in the later RFC analysis, the ALJ mostly doubted plaintiff's testimony, finding that it was "replete" with "numerous" inconsistencies. Specifically, the ALJ relied on the following eights inconsistencies: (1) plaintiff claimed that she had used a wheelchair for many years but only obtained one shortly before the hearing; (2) no medical evidence corroborated plaintiff's alleged inability to walk; (3) during a time when plaintiff was experiencing a flare, she one time

---

[3] *See* R. 13 ("The [ALJ] credits the diagnosis of fibromyalgia fatigue syndrome made by Dr. Sridhar despite the fact that the tender points are not described [] and the claimant does not seek rheumatologist treatment[.]" ).

had to "walk off" for several hours the bad side effects of a medication; (4) plaintiff engaged in wide and varied daily activities; (5) plaintiff did not like Western medicine, but used an antibiotic on one occasion; (6) plaintiff rejected treatments without trying them; (7) plaintiff did not seek treatment from specialists such as neurologists and rheumatologists; and (8) although plaintiff was in college the year before the hearing, she testified that she could not recall when she was in college. To simplify the analysis, these eight reasons can be arranged into sub-groups.

**Malingering: Wheelchairs and Walkers.** Several of these reasons (specifically, #1, 3, and 8) go to plaintiff's truthfulness. The first reason, however, clearly stands out among the rest. The ALJ concluded that plaintiff stated that she had used a wheelchair and walker on almost a daily basis for many years when, in fact, she only obtained these assistive devices on the eve of the hearing. The obvious implication is that she was putting on a show and lying. The ALJ clearly put much weight on this assertion, referring to it as "significant" and discussing it at length four separate times throughout the decision. By its very nature, this type of argument—*falsus in uno falsus in omnibus* (false in one, false in all)—has the potential to dominate all others like the proverbial skunk thrown in the jury box. It is also the type of argument that the new credibility regulation, SSR 16-3p, has specifically cautioned ALJs to be careful employing.[4] Given these high stakes, it is important that the factual basis for this strong accusation be solidly grounded. This is where this Court has concerns.

Although the ALJ addressed this argument several times, the following excerpt provides a sufficient summary of this argument:

---

[4] *See* SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 ("our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus [] should not be to determine whether he or she is a truthful person."); *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (ALJs should not be "in the business of impeaching claimants' character," although they may still assess "the credibility of pain *assertions* by applicants") (emphasis in original). This Court agrees with Judge Griesbach's excellent opinion in *Geer v. Berryhill*, 15 C 1470, 2017 U.S. Dist. LEXIS 42308, *37 (E.D. Wisc. Mar. 23, 2017) that the new regulations place the ALJs in a very difficult spot, particularly in cases involving fibromyalgia.

> Although the claimant wrote she used assistive devices daily (Exhibit 3E/2, 6, and 7), it appears the claimant has only used assistive devices in the four months leading up to the hearing. *The first time a doctor noted the claimant using an assistive device was on June 17, 2014.* The claimant walked with a walker on June 17, 2014 at Dr. Sridhar's office, and she asked Dr. Sridhar for a prescription for both a walker and a wheelchair that day (Exhibit 7F/22-23). On September 30, 2014, the claimant told Dr. Sridhar she only received a walker (Exhibit 9F) and needed a prescription for a wheelchair too (Exhibit 11F/5). The claimant rented a wheelchair on October 7, 2014 (Exhibit 10E), despite indicating she had one she that she frequently used in the March 2013 Function Report (Exhibit 3E/2 and 7).
>
> \*   \*   \*
>
> Essentially, the [ALJ] observed in the records that the claimant was using assistive devices in the last few months preceding the hearing at some medical appointments. She lobbied for the wheelchair and walker with no current diagnosis of Lyme disease (Exhibit 7F/22). The claimant does not seek rheumatologist treatment. She does not seek neurologist treatment. There is no clear documented persistent trigger or tender points on examinations (Exhibits 7F, 11F, 12F).

R. 19 (emphasis added).

As a preliminary point, this description suggests that the ALJ believed that plaintiff was not merely exaggerating or misremembering events but was lying by falsely portraying herself as having used a wheelchair or a walker for many years. For example, the ALJ used the word "lobbied" to describe plaintiff's efforts to get a wheelchair and walker and pointed out that plaintiff twice made this request (two days apart) to two different doctors, ominously suggesting that plaintiff was doctor shopping or that her doctors doubted her need for the wheelchair. The ALJ added that there was "no current diagnosis of Lyme disease," implying that there was no medical reason to justify the assistive devices, which oddly leaves out that fibromyalgia (not Lyme disease) was the main diagnosis and that the ALJ herself found that there was a valid current diagnosis. These descriptions bolster the conclusion that the ALJ believed plaintiff was malingering even though the ALJ never used this word.

8

But the ALJ's theory rests on one important factual predicate—namely, the following: "The first time a doctor noted the claimant using an assistive device was on June 17, 2014." However, as plaintiff points out, there is at least one instance in which a doctor, on an earlier occasion, "noted" that plaintiff had been using a wheelchair. On March, 2, 2013, Dr. Manas stated the following: "The patient has been evaluated by psychologists at Mayo Clinic in 2005. She has been in a wheelchair since 2004." R. 250. This statement undermines the ALJ's factual premise, which in turn raises doubts about the ALJ's larger (implicit) malingering accusation.[5] To the extent that a credibility finding is based on an error of fact, which this one seems to be, then this is a ground for remand. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").[6]

In addition to this one important piece of counter-evidence, plaintiff submitted other corroboration. After receiving the ALJ's decision and realizing that the ALJ believed that she was lying on this point, plaintiff obtained three letters from her healthcare providers, and submitted them to the Appeals Council.[7] *See* R. 371 (letter from Dr. Sridhar: "I have witnessed [plaintiff] to be in a wheelchair at times, due to her [fibromyalgia], since her first visit on 10/23/2013 through the present time."); R. 370 (letter from Dr. Bouc: "I was her Primary care physician from June of 2006 until January of 2008. [] Over this time frame I have seen Kayla Potega have intermittent paralysis that has rendered her wheel chair bound and also unable to

---

[5] The Government briefly and unconvincingly addresses this counter-evidence at the end of its sur-reply brief, stating in a footnote that "it is unclear whether this reference is based on personal observation [or] Plaintiff's own subjective report." Dkt. # 16 at 3 n.2. The Government seems to be making a fairly technical distinction between "noting" and "observing," but the ALJ used the word "noted" and did not make such a distinction.

[6] Other questions exist about the ALJ's wheelchair fabrication theory. For example, neither Dr. Sridhar nor Dr. Bouc indicated in their notes that plaintiff's requests were unusual. They did not suggest that there had been a worsening of plaintiff's condition to necessitate use of these assistive devices. In fact, Dr. Bouc merely made the following low-key notation: "[Plaintiff] needs refills of meds and for walker. Again she has intermittent paralysis etiology unknown." R. 357. Although one cannot be certain, the word "refill" in this sentence could be interpreted as applying to both the medications *and* the walker—*i.e.* that plaintiff had an earlier prescription for a walker and was simply getting it renewed for some reason.

[7] At the hearing, the ALJ never directly confronted plaintiff about these accusations of malingering, and, thus, never gave her the opportunity to offer an explanation.

9

ambulate without a walker."); R. 372 (letter from Carl Patrnchak, physical therapist: "[O]ur facility has been treating [Kayla Potega] from May 20, 2014 to present. During this time, Kayla has intermittently needed to arrive in our clinic using a walker and/or wheelchair[.]"). Because this evidence was not submitted to the ALJ originally, a question arises whether it could be a basis for a Sentence Six remand now. The Government argues that plaintiff has not met the requirements for such a remand, and that, in any event, plaintiff waived this argument by not raising it until the reply brief. There is no need to resolve these issues because the Court concludes that a remand would be justified even if without this evidence. However, on remand, this evidence should be considered along with all the other evidence.

Although the wheelchair fabrication rationale overshadowed all the other reasons, the ALJ also claimed that plaintiff was inconsistent (and perhaps untruthful) when she stated that she once walked off the bad side effects from a medication and when she stated that she could not remember whether she had last taken a college course. But here too, the factual predicates for the alleged inconsistencies are fuzzy. As for the first point, the alleged inconsistency only exists if the "walk off" incident occurred during a bed-confining flare. However, the record is vague about the precise timing and length of these flares. The ALJ relied on plaintiff's testimony, but this testimony consisted of vague references, such as "last year" and "the fall" and other similar phrases, and in several instances there seemed to be confusion about what dates were being referred to, all of which raises the concern as to whether plaintiff was actually in a flare on this one occasion. If not, then there is no inconsistency. A similar concern arises as to the alleged inconsistency about when plaintiff last attended college. The testimony on this point was likewise confusing about the precise dates.

For all the above reasons, the Court finds that this evidence is too ambiguous based on the current record to reach the strong conclusion that plaintiff was malingering. As plaintiff observed in her opening brief, "[n]otably, none of Kayla's treating doctors had even suggested that she was malingering." Dkt. #7 at 8.

**Lack of Objective Evidence.** The ALJ's argument that there was no corroborating objective medical evidence is problematic because it requires that plaintiff must "prove" her pain allegations with this type of evidence. However, as the Seventh Circuit has emphasized, Social Security Regulation 96-7p(4) provides that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"); *Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays."). This issue is especially relevant to conditions like fibromyalgia. *See Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints."); *but see Geer*, 2017 U.S. Dist. LEXIS at *37 (noting that ALJs will have a difficult time making adverse credibility determinations in cases involving fibromyalgia).

The ALJ suggested that there was no objective evidence, but the ALJ's own earlier finding that fibromyalgia qualified as a severe impairment necessarily meant that doctors had

11

found that there was some objective evidence to warrant this diagnosis. *See* SSR 12-2p. More broadly, the ALJ did not call a medical expert to testify at the hearing. *See Merriman v. Berryhill*, 15 CV 50073, 2017 U.S. Dist. LEXIS 81848, *8-9 (N.D. Ill. Feb. 27, 2017) ("To rule out a myriad of other possible causes makes it even more important for there to be an expert, preferably from a rheumatologist, rather than having the ALJ make an arm-chair diagnosis. For this reason, on remand, the ALJ must call a medical expert. HALLEX I-2-5-34.A.1."). Therefore, the ALJ's analysis of what the various "normal" findings meant in terms of fibromyalgia necessarily involved doctor-playing. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Plaintiff's doctors, who made the underlying findings the ALJ relied on, did not believe that these findings invalidated the diagnosis of fibromyalgia nor that they were a reason to disbelieve plaintiff's pain allegations. To cite one example, taken from the ALJ's decision, there is the following summary of Dr. Bouc's notes: "The claimant received a Toradol injection. She had normal gait and posture." R. 16. Why would a doctor inject pain medication if everything were normal? There are other instances in the record where doctors observed a normal gait or some other normal finding but nonetheless kept diagnosing plaintiff with fibromyalgia and kept recommending pain medication or other treatments.[8] For these reasons, on remand, the ALJ must call a medical expert. *See* HALLEX I-2-5-34A.1.

**Activities of Daily Living.** The ALJ found it inconsistent that plaintiff engaged in physical activities such as yoga and household chores, and did other activities like jewelry, blogging, and reading. The latter activities, plaintiff stated, could be done while in bed. This argument suffers from the same concern set forth above about the uncertainty of the flares.

---

[8] There are also notes in the record where doctors recorded plaintiff's pain complaints. *See, e.g.*, R. 250 (Dr. Manas 3/2/13 note: "She has called me numerous times since [July 26, 2012] with incapacitating pelvic pain that has brought tears to her eyes and wanted to go to the emergency room.").

These activities would only be inconsistent if plaintiff engaged in them during a flare. For the reasons already stated, the record is not clear about the precise timing of these flares in relation to when plaintiff engaged in these activities.

**Conservative Treatment.** Three of the ALJ's eight credibility reasons fall under the general rubric of conservative treatment. The ALJ noted that plaintiff did not seek treatment from specialists; she rejected Western Medicine; and she "often" rejected treatments. These arguments suffer from several problems.

First, the ALJ failed to acknowledge that plaintiff tried many treatments over the years and that many of them failed. She also saw specialists, especially earlier on in her illness, including a visit to the Mayo Clinic, which the ALJ noted at the hearing likely would have been "quite an extensive evaluation." R. 32. Although the record does not reveal any details about what these doctors concluded, it is possible that plaintiff was told that there were no special surgeries or other simple treatments available. *See* Mayo Clinic Website, "Fibromyalgia: Treatment" ("The emphasis is on minimizing symptoms and improving general health. No one treatment works for all symptoms."). However, even limiting the analysis to plaintiff's more recent treatments, the ALJ gave little weight to the fact that plaintiff was seeing a pain specialist (Dr. Rosche) at the time of the hearing and that he had prescribed a Fentanyl patch. Plaintiff also tried many other treatments. *See, e.g.,* R. 293 ("Has had chiropractor, massage, acupuncture[;] Also had negative effects from calcium/D/chasteberry, magnesium. Exercising helps a bit. Got sick on activated charcoal. Didn't tolerate chelation."); R. 348 ("Will see Dr. Bouc in 2 days for Meyer's cocktail. Getting myofascial release therapy twice a week, not sure if it's helping, has been going for 3-4 weeks"); R. 349 ("Takes advil more frequently. Excedrin PM was helpful, but

13

off the market. Ultram helps if coupled with advil, has to take something 2 hours."). In general, the ALJ downplayed these many efforts to find an effective treatment.

Second, as for the specific charge that plaintiff was irrationally eschewing Western medicine, the ALJ both overstated plaintiff's testimony and again downplayed her treatment history. The ALJ gave the impression that plaintiff *completely rejected* "Western medicine" (a term that's never defined). Here is how the ALJ summarized plaintiff's testimony: "the claimant indicated she could not tolerate Western medicine *and did not take it*." R. 19 (emphasis added). But plaintiff's testimony was more nuanced. She stated that she had a "sensitivity to" Western medicine and described several instances where she had a bad reaction to prescribed medications and then decided—not unreasonably it would seem—to avoid those medications. *See, e.g.*, R. 349 ("Bad stomach effects after taking a different form of Excedrin PM. Feels like stomach is being ripped apart after everything she's been eating."). Also, plaintiff chose not to use a particular medication (Cymbalta) but did so only "after looking up [possible] side effects." R. 342. This does not suggest that she adopted a rigid or irrational approach. Contrary to the ALJ's conclusion, plaintiff tried many treatments that were within the broad category of Western medicine. Finally, even if certain medications were nontraditional, this does not automatically mean they were invalid, especially with a hard-to-treat condition like fibromyalgia. The Mayo Clinic website states, for example, that "alternative therapies" for fibromyalgia—such as acupuncture and massage therapy, two treatments plaintiff tried—"are gaining acceptance in mainstream medicine."

## II.     Treating Physician Rule.

Having found that a remand is warranted on the first argument, the Court will only briefly address the second argument, although the Court finds that it provides an additional ground for

14

remand. Plaintiff asserts that the ALJ failed to apply the treating physician rule by not giving controlling weight to the opinions of Dr. Sridhar and Dr. Bouc. Dr. Sridhar opined that plaintiff's "medical conditions cause her to be bedridden for at least 2 weeks per month, making it impossible for her to hold a steady job." R. 324. Dr. Bouc opined that "[t]he randomness and density of her symptoms makes it impossible to stay employed as she is completely unable to ambulate when she is symptomatic." R. 357.

The Government concedes that the ALJ failed to explicitly follow the treating physician rule by, among other things, not applying the checklist of factors. However, the Government argues that this error should be overlooked under a harmless error analysis because the ALJ implicitly addressed the relevant factors. The Court is not persuaded that this case is a good candidate for the harmless error doctrine. For one thing, the Court has already concluded that a remand is warranted and therefore there is no need to strain to find that the error was harmless. For another thing, the ALJ's implicit analysis of the checklist in Step Two rested in part on the assumption that there must be objective findings to corroborate the intensity of plaintiff's pain, which as noted above is an assumption not based on any medical testimony in the record. On remand, the ALJ should follow the treating physician rule by explicitly applying both steps required by this rule. As plaintiff argues, Dr. Bouc's and Dr. Sridhar's opinions were consistent with each other. The first step of the treating physician rule focuses on this very question.

On remand, the ALJ should call a medical expert. HALLEX I-2-5-34A.1. Also to the extent there are doubts about how often plaintiff was bedridden, how often she used a wheelchair or walker, and other similar questions, the ALJ should seek a statement from plaintiff's family and friends. SSR 12-2p states explicitly that "information from nonmedical sources," such as "[n]eighbors, friends, relatives, and clergy," are helpful in evaluating "the severity and functional

15

effects of a person's [fibromyalgia]." As one doctor noted, plaintiff's mother "always [came] in" with plaintiff on doctor visits. R. 250. She would seem to be an ideal candidate to provide input.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: June 7, 2017          By: _____
                                                   Iain D. Johnston
                                                   United States Magistrate Judge